MARILYN E. BEDNARSKI (SBN 105322)
E-Mail: mbednarski@mbllegal.com
McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Elpidio Reyna
Defendant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. CR 2:25CR00642-Def. 1 |
|---|---|
| Plaintiff, | |
| vs. | POSITION REGARDING PRESENTENCE REPORT; DECLARATION OF BEDNARSKI; EXHIBITS 1-7 |
| ELPIDIO REYNA, | Sent. Hrg: 8/07/26 at 11:00 a.m. |
| Defendant. | |

Elpidio Reyna, through her counsel of record Marilyn E. Bednarski, hereby presents his position regarding the revised presentence report in this case. Dkt. 24. This position is based upon the attached Memorandum of Points and Authorities, Declaration of Bednarski, and Exhibits.

Dated: July 17, 2026          Respectfully submitted,

                              By,
                              MARILYN E. BEDNARSKI
                              Attorney for Defendant Reyna

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.      **Introduction**

Well supported variances and consideration of § 3553 factors justify a sentence with no further prison time.

II.     **Request to Strike or Ignore Erroneous References to Concrete**

The PSR repeats at 15, 49 statements --apparently from government reports -- that he threw cement blocks "as well as rocks or pieces of concrete" are not true. To the extent it can mislead the court to believe a more significant weapon was employed than simple rocks, these unfounded claims should be struck from the PSR or at a minimum not relied on.

Mr. Reyna denies throwing concrete or pieces of cement. Declaration Bednarski at ¶3. He was one of the many concerned members of the Paramount community who came out to protest on June 7 out of a pervasive fear, concern, and anger towards the immigration raids. *Id*. at ¶7. The many concerned individuals tried to do what they could to impede the raids by impeding the DHS vehicles. Videos of the protest show people standing on the median or in the street, throwing objects at government vehicles. *Id*. at ¶7. On video Elpidio is seen collecting palm sized rocks from the dirt portion of the median. *Id*. at ¶¶ 4-6. No concrete or cement blocks appear to be present in the dirt area. *Id*. at ¶¶ 4-6.

III.    **The Bodily Injury Enhancement Is Not Factually Or Legally Supported**

The government cannot on the facts here satisfy the burden attendant here to an upward adjustment by a preponderance of the evidence. *United States v. Munoz*, 233 F. 3d 1117, 1126 (9th Cir. 2000).

The bodily injury enhancement under U.S.S.G. § 2A2.2 and as defined in the cross-referenced guideline § 1B1.1 application note 1(B), requires a significant injury — one that is painful and obvious or of a type for which medical attention ordinarily would be sought. The guideline clearly does not apply to all injury or to any injury, but

only more significant injury, thus the narrowing words "painful and obvious, or of a type for which medical attention ordinarily would be sought." If any injury was enough, there would be no need for the sentencing commissions narrowing words in § 1B1.1. Federal courts across multiple circuits support that temporary minimal pain such as occurred here, with no lasting effect and no need for medical attention, falls short of the guideline's definition.

In *United States v. Gasca-Ruiz*, the *en banc* Ninth Circuit recognized and applied this definition in a case involving a more serious injury, where the kidnap victim confined to a trunk suffered several lacerations and a burn, quoted the guideline definition verbatim, emphasizing that bodily injury means any significant injury, such as one that is painful and obvious or of a type for which medical attention ordinarily would be sought. *United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir. 2017). The court's focus on the significance qualifier confirms that the definition is not satisfied by any degree of pain, however fleeting. The facts supporting application of the enhancement in *United States v. Greene* are similarly distinguished as the injury there was also more serious, involving a blow to the head, with visible redness and swelling, found to be "the type of injury for which medical attention ordinarily would be sought." 964 F.2d 911 (9th Cir. 1992).

The defendant's position that "minimal" or "trivial" injuries are insufficient to support the enhancement is further supported by opinions found in at least four other circuits. *See United States v. Guerrero*, 169 F.3d 933 (5th Cir. 1999)(reversing a bodily injury enhancement where the sentencing judge stated that only a "minimal, minimal injury" was required, and holding that such a standard, taken at face value, is contrary to the guideline's definition, which requires any significant injury before listing the two illustrative categories); *United States v. Lancaster*, 6 F.3d 208 (4th Cir. 1993)(holding in a case where a security guard was sprayed in his eyes with mace that injuries that are either momentary, with no lasting effects, or wholly trivial are not a "significant injury"

for the enhancement purposes); *United States v. Perkins*, 132 F.3d 1324 (10th Cir. 1997)(holding a laceration and bruising from a gun strike and continual neck and shoulder pain justified a two-level enhancement, and residual pain was sufficient to qualify an injury as bodily harm and explaining that for bodily injury to be "significant," the injury cannot be wholly trivial, and while it need not last for months or years, it must last for some meaningful period); *United States v. Mejia-Canales*, 467 F.3d 1280 (10th Cir. 2006)(reversing a bodily injury enhancement where the primary evidence showed only a small laceration on the inside of the victim's mouth and a red mark on the forehead treated with ibuprofen and an oral gel, with no evidence that the injuries were painful or lasting).

## IV.    Consideration Of All The 3553 Factors Show That A Sentence With No Further Prison Time Is Sufficient And Not Greater Than Necessary

The defendant's request for a below guidelines sentence is well supported.

### A. A Variance Is Appropriate Where a Rigid Application of the Guidelines Results in a Calculation that Overstates The Offense

Even if this court were to disagree with the defense analysis of bodily injury above, even "correctly" applied enhancements can so overstate the seriousness of the offense as to require a variance under 3553(a). *United States v. Amezcua-Vasquez*, 567 F. 3d 1050, 1051-52 (9th Cir. 2009) (finding court abused its discretion in failing to vary in overstated criminal history context); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D. N.Y., 2006)(finding variance supported in fraud context where loss overstated role and stacking of multiple enhancements resulted in "piling-on" of points ill-suited to Adelson's position).

### B. A Variance is Warranted Based on Family Circumstances and The Importance of Mr. Reyna's Care Role

When a defendant presents an argument for a lower sentence based on family circumstances, the relevant inquiry is the effect of the defendant's absence on his

family members. It is worth noting that pre-*Booker*—that is before the 2005 Booker decision, a "departure" from the guidelines required a showing of extraordinary circumstances, a standard no longer required, as all mitigation bearing on an individual's history and characteristics can be considered under § 3553(a).

The pre-2005 cases are informative anyway as they reflect a history of sentencing jurisprudence recognizing that unique family circumstances are mitigating. *See, e.g., United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992)(defendant was 38 year old single mother of three of her own children and of the infant of her institutionalized daughter); *United States v. Dominguez*, 296 F.3d 192 (3rd Cir. 2002) (bank fraud case where district court erred in holding it could not depart four levels downward for defendant who resided with her elderly parents, who were physically and financially dependent upon her where father had undergone brain surgery and had suffered a heart attack); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (defendant and wife cared for four and eleven year old and disabled father and paternal grandmother, incarceration could well result in destruction of an otherwise strong family unit); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (in drug case variance from 40 months to one day in prison and 270 days home confinement holding district judge properly determined that defendant's family would "benefit more by [defendant's] presence than society is going to benefit from [her] incarceration.").

There is no question that Mr. Reyna dedicated most of his adult life and energy to his family and helping to support that family. Attached, Exhibit 5, family photo montage. And it was challenging, as he and his partner Carmen Vela had to learn how to parent, and more challenging how to parent a severely autistic son. Their son, Eduardo, who is now 17 years old, is autistic and needs substantial and continuous support and care. He is not left alone at home, does not travel outside the home by himself, and may never be able to live on his own. With the incredible patience, support and teamwork of his "anchor" providers (his mother, Mr. Reyna, school aides etc.),

5

Eduardo has achieved a second/third grade level of functioning in math and reading, and limited vocabulary, but is a "happy, loving person." Exhibit 5, photo montage (showing a happy loved young man included in family activities). He will continue in school until he is 22 years old, but to flourish he will need the strong support and teamwork from all his anchor people including Mr. Reyna.

As supported by the presentence report and attached letter Exhibits 1-4,  Mr. Reyna has been integral to Eduardo's development and accomplishments.

### C. A Variance Is Warranted Based on Mr. Reyna's Individual Characteristics

Before the incident in Paramount, CA, Elpidio led a full life. He was routinely balancing the financial weight of supporting a family of four, caring for his son who is on the autism spectrum, and the needs of his marriage. Elpidio was not only trying to survive, but he was trying to thrive. He aspired to own a home, take his family on trips, ensure his son had equal opportunities as any neurotypical child would, and to be a business owner. For the most part, Elpidio was able meet the needs of his responsibilities and achieve his goals. He was able to do this in large part to his kind and patient nature, and most importantly the love he has for his family. Exhibits 1-4, Letters from Elpidio Reyna, Carmen Vela and Evelyn Reyna.

His daughter, Evelyn, fondly recalled in her letter that he showed her how to ride a bike, cook, drive, and change a car's oil. With all the stressors of work and family, Elpidio was able to tap into a patient, kind, and supportive love to show his daughter lifelong lessons and skills. She also described how instrumental Elpidio is for her brother's life. Elpidio ensured that he had the same experiences that a neurotypical child would have. Elpidio also wanted his children to thrive, not just survive.

There were few people outside of family that knew of all the stresses and struggles that Elpidio experienced. Roy Kaiser, owner of Record Recycler, was one of them. He has been in the record selling business for over 35 years. In his letter, Roy

described the record selling business as being hard to break into. Exhibit 4, Letter from Roy Kaiser. He figured that it would be even harder for Elpidio to break into the business as he was someone with little knowledge of record collecting. Nonetheless, Roy attributed Elpideo's success to his "energy and hustle." Roy described Elpidio as a person that led with consistency and patience. He explained that Elpidio would come into his store with questions of the record selling business and vinyl records. He added that Elpidio would also bring lunch for Roy on occasion – a gesture rarely seen between members of the record selling community.

Mr. Reyna's conduct on June 7 was aberrant to his life and character that has demonstrated patience in balancing and navigating the financial, family, and social stressors of his day-to-day life. He ultimately found the time to nurture his children at different stages of their lives. Elpidio was also able to be disciplined and patient with himself while learning to compete and succeed in the record selling business. He was trained to work with heavy machinery and had no experience in record selling. As he navigated a business that is saturated with vendors, he patiently worked to find a way to succeed within his means.

## V.    A Non-Prison Sentence Will Satisfy the 3553(a) Factors

As set forth below, a non-prison sentence with supervision and home confinement, and restitution satisfies the requirements of § 3553. *Dean v. United States*, 581 U.S. 62, 67 (2017)(parsimony principle means this court shall "impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."). The § 3553(a) analysis is holistic, as the sentencing court is required to consider the totality of circumstances. *Gall v. United States*, 552 U.S. 38 (2007). The punishment must fit the offender and not merely the crime and so all relevant personal and family circumstances must be considered. *United States v. Lizarraras-Chacon*, 14 F.4th 961 (9th Cir. 2021).

**A. One § 3553 Consideration: Just Punishment**

Here the combination of pretrial detention of over a year, property damage[1], income loss, the emotional trauma suffered from the disruption in care for Mr. Reyna's special needs son and his daughter's withdrawal from college and her financial grant, presents a compelling case that the retributive and punitive purposes of § 3553(a)(2)(A) have already been substantially served.

As argued below, a sentence with no further incarceration would be "just punishment" here considering the factors 3553 describes including seriousness of the offense, respect for the law, history of the offender and sentencing disparity.

**1. The Seriousness of the Offense**

Here the offense is a substantial one, as it involved violence, but as argued above, any injury was minimal. In addition, as addressed below (see § 4) a sentence of "time served" would not be disparate from other protest assault cases.

**2. Respect for the Law**

Mr. Reyna has suffered an experience of great magnitude, with serious personal and familial consequences. Mr. Reyna initially ran away because he was scared, but shortly thereafter surrendered after obtaining counsel who coordinated his safe surrender to the FBI. His letter to the court further reflects insight gained, remorse and sincere apology for his conduct.

**3. The History of the Offender**

The criminal conduct is aberrant to Mr. Reyna's life, defined by a long history of gainful employment and commitment to family. He is 41 years old and he and his life partner Carmen Vela have been a couple since they were 17 years old and together raised two children, one of whom is a severely autistic teenage boy. With the two of

---

[1] In the execution of the warrant at their home while looking for Mr. Reyna, the agents significantly damaged the home's perimeter gate, the van they owned, the living room carpet and cause their family dog to run away and never be found. Exhibit 7, photo montage of damage and news article re violent raid.

8

them working, they were able to afford to buy and fix up a rundown house on a metro trackside street. The family has suffered in tangible ways without his presence and economic support as his daughter had to drop out of college and sacrifice a hard-earned grant to help care for her special needs brother.

### 4.  Sentencing Disparities

A sentence of no further incarceration for Mr. Reyna, who has been in custody for over a year, will not result in an unwarranted disparity. For his conduct during one of the 2020 George Floyd protests, defendant George Allen was convicted of felony civil disorder resulting in the obstruction of commerce under 18 U.S.C. §232(2), for throwing a piece of concrete at a police vehicle shattering the windshield and injuring the officer inside. *United States v. George Allen*, 2:20-cr-00168-AJS (W.D. Penn.). Mr. Allen was sentenced to a year and a day in custody. See Dkt. 1, Indictment, Dkt. 65, Govt. Sent. Pos., Dkt. 73. In another rock throwing case, an L.A. protest case from last year, Mr. Guzman was convicted of assault on a federal employee under 111(a)(1) for throwing a rock at the officer who was standing guard outside the Roybal building in one DHS protest. The rock struck the glass shield of the officer's helmet, damaging it. Guzman had additional rocks in his pocket. He was sentenced to one year probation. *United States v. Thomas Guzman*, 2:25-cr-00543-FMO (CDCLA), Dkt. 38 (docket entry) & Dkt. 28, Govt. Sent. Pos. p. 2-3.

Further, the administration granted sweeping clemency to all of the nearly 1,600 people charged in the January 6, 2021 attack on the US Capitol. https://www.cnn.com/2025/01/26/politics/january-6-rioters-charges-convictions-dg.

Finally, the statistics kept by the JNIN and sentencing commission for § 111 cases do not break out protestors, nor identify cases with extremely minor injury and thus do not provide enough detail to understand if persons are sufficiently comparable for disparity purposes.

### B. Another 3553 Consideration: Need, if any, for Deterrence

The physical, mental, and financial harm already suffered are consequences enough to deter Mr. Reyna from reoffending.

### C. Another 3553 Consideration: Need, if any, to Protect the Public

There is no evidence to suggest that Mr. Reyna is a threat to the public. This conduct was aberrant to his law-abiding life. His exemplary conduct at the MDCLA is evidence of that. Few inmates are trusted like he is, with watching over other inmates at risk of suicide.

### D. Last 3553 consideration: Need, if any, for Rehabilitation

This fourth §3553 factor, concerning the need for educational or vocational training or other correctional treatment, is inapplicable here. There is no need for "forced" rehabilitation; Mr. Reyna voluntarily desires to participate in anger management because he wants to be the best person he can be for his family and community. His emotions got the best of him that day in June, amidst the emotional community response to the immigration service's violent invasion in Paramount (and the day before in LA).  Mr. Reyna's conduct was aberrant; he does not have a pattern or history of violent behavior.

## VI.    Conclusion

The reasons articulated above and the facts set forth in the presentence report and Exhibits support the appropriateness of a sentence of supervision with conditions but no further prison time.

Dated: July 17, 2026                    Respectfully submitted,

By, _Marilyn E Bednarski_
MARILYN E. BEDNARSKI
Attorney for Defendant Reyna

10

## <u>DECLARATION OF MARILYN E. BEDNARSKI</u>

I, Marilyn E. Bednarski, declare:

1. I am an attorney licensed to practice in the State of California and a partner at the firm McLane, Bednarski & Litt, LLP. I am counsel of record for Elpidio Reyna in *United States v. Reyna*, CR 2: 24-CR-00642-Def. 1. This declaration is submitted in support of his sentencing position.

2. The seven exhibits attached to this sentencing position are true and correct copies of the documents and photographs I received and described herein.

3. Mr. Reyna has advised me that he threw rocks he picked up from the median but did not throw cement blocks, or pieces of concrete.

4. I reviewed the discovery in the case and recall no video or photographic evidence that would support the references to cement or Mr. Reyna was throwing cement.

5. The discovery I reviewed included what I consider the government's primary evidence of Mr. Reyna's rock throwing (marked in government PROD2\Social Media Videos\REYNA 1.mp4). Elpidio is seen collecting palm sized rocks from the dirt portion of the median. I could see no concrete slabs or blocks in the dirt area.

6. Prior to preparing and filing this sentencing pleading I asked a paralegal in my law firm, Benjamin Juarez, to review the videos in discovery as well as any videos he could find on the internet of Mr. Reyna throwing anything at government vehicles on June 7 to confirm, or not confirm, whether he threw rocks from the median, as opposed to concrete blocks. Mr. Juarez advised me that he could find no video evidence of Mr. Reyna throwing concrete blocks or broken concrete blocks.

7. A class action lawsuit filed on behalf of journalists describing the large community response to the violent acts of the DHS is publicly filed and includes numerous declarations describing the DHS agents' violent actions against the

journalists and protestors. *Mena v. Department of Homeland Security*, 2:25-cv-05563 (class recently certified). An example video of scenes of the Paramount protest activity can be publicly found at https://www.youtube.com/watch?v=7tkouiiJ-RQ&t=40s. The captured images show the great number of community members who came out, and show many people throwing things at government vehicles, none of whom are Mr. Reyna in these images. The images demonstrate that if concrete were thrown, it may well have been by others. The images in the video clearly show a large number of community members protesting amidst smoke from tear gas and flash bang grenades, in what was clearly a chaotic scene. Here is one photo from that day:



I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed on July 17th , 2026 at Pasadena, California.

By /S/ Marilyn E. Bednarski__
Marilyn E. Bednarski

DM187971